IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| ALEXA R. NEMETH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:19-cv-715-RAH-JTA |
| ) | [WO] |
| AUBURN UNIVERSITY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Alexa R. Nemeth ("Nemeth") is a former walk-on softball player for the Auburn University ("Auburn") women's softball team. She brings suit against Auburn for retaliation in violation of Title IX, 20 U.S.C. § 1681 et seq., claiming that Auburn retaliated against her when the university denied her a roster spot on the team after complaining about, and participating in, an investigation involving sexual improprieties by the previous coaching staff. (Doc. 27 at 2, 15-16.)

Before the court is Auburn's Motion for Summary Judgment ("motion"), filed on January 15, 2021. (Doc. 53.) Nemeth has filed a brief in response (Doc. 57), and Auburn a reply (Doc. 59), making the motion ripe for resolution. For the following reasons, the motion is due to be granted.

**I.   PROCEDURAL BACKGROUND**

This case has a somewhat complicated procedural history. To begin, Nemeth originally filed suit against Auburn, as well as former team coaches Clinton Myers ("Clint") and Corey Myers ("Corey"), and former Auburn presidents Jay Gogue, and

1

Steven Leath. (Doc. 1 at 2.) In her original complaint, filed on September 25, 2019, Nemeth brought claims for: (1) Title IX sex discrimination against Auburn, (2) sexual harassment in violation of 42 U.S.C. § 1983 against all defendants, (3) Title IX retaliation against Auburn, (4) retaliation in violation of 42 U.S.C. § 1981 and § 1983 against all defendants, and (5) failure to supervise in violation of § 1983 against all defendants. (Doc. 1.)

The details of the Myers' coaching tenure with the Auburn softball team bear little repeating given the story's intense coverage in the media.[1] In a nutshell, particularly as to Nemeth, she believed that Corey's individualized coaching attention, praise, and other behavior directed toward her was done "in an effort to groom her for his other, more nefarious, purposes" (*see* Doc. 27 at 9); that is, a sexual relationship.

In response to a series of motions to dismiss filed by the Defendants (*see* Docs. 20, 21, and 22), which were principally based on the statute of limitations, Nemeth amended her complaint and limited her cause of action to a single count—a Title IX retaliation claim against Auburn for depriving her of a roster spot on the team for the 2017/2018 year. (Doc. 27 at 15; *see also* Doc. 40.) It is solely that claim which is at issue in this case.

## II.   FACTUAL BACKGROUND

After receiving an invitation for a walk-on position from Corey, Nemeth enrolled as a student at Auburn in the Fall of 2016. (Doc. 57-1 at 2–3.) Corey was the assistant head coach at the time and is the son of the then-head softball coach Clint Myers. (*Id.*)

---

[1] *See generally* Tom Junod, "For Auburn Softball, Joy on the Surface Obscured Darker Truths Within," ESPN, June 1, 2018, available at https://www.espn.com/espnw/voices/story/_/id/23596770/for-auburn-tigers-softball-joy-surface-obscured-darker-truths-within.

During the Fall of 2016, Corey took an unexplained leave of absence from the team. (*Id*. at 4.) Until that point, Corey had been giving Nemeth favorable feedback in her development, but when Corey left, Clint criticized her level of play, at one point telling her she "sucked" compared to another pitcher. (*Id*.) Nevertheless, Nemeth was given favorable comments about her progress in front of the team but given minimal scrimmage game time. (*Id*.) In the Spring, despite Clint's negative assessments about her ability as a pitcher, Nemeth was allowed to travel with the team to at least one conference series. (*Id*. at 5.)

On March 30, 2017, Corey abruptly resigned as assistant coach, apparently due to an inappropriate personal relationship with a teammate. (*Id*. at 6.) Once Corey resigned, the other coaches effectively eliminated Nemeth's participation during practice. (*Id*. at 7.)

Displeased with her reduced role, the team environment, and the issues with the coaching staff, Nemeth met with the Auburn athletic director and other staff. In particular, Nemeth believed that Clint knowingly allowed Corey to groom and have sexual relationships with team members. (*Id*. at 8–9.) Nemeth believed she, too, was being groomed as she felt pressured to engage in inappropriate and/or sexual relationships with Corey to receive better treatment at practice and at games. (*Id*. at 9.)

Nemeth and her father complained to Auburn about this situation on May 29, 2017. (*Id*.) That same day, during her year-end meeting with the coaching staff, including Clint, Nemeth was told that the coaches did not see a role for her on the team the following season, and therefore Nemeth was removed from the roster that day. (*Id*. at 10.) Following this and other meetings with university officials, Nemeth filed a Title IX complaint, alleging Title IX and NCAA rule violations. (*Id*.)

3

Ultimately, Clint Myers retired on August 23, 2017, (*id*. at 13), and a new coaching staff, led by Michael Dean, was hired shortly thereafter in early September. Almost immediately, the new staff scheduled and conducted open tryouts. (*Id*. at 13.) None of the participants made the team, including Nemeth, who was on the team the year before. (*Id*.; *see* Doc. 54-1 at 5.)

Nemeth then left Auburn and enrolled at Elon University, where she played on Elon's softball team. Nemeth filed the instant lawsuit on September 25, 2019, seeking, *inter alia*, damages and placement on the Auburn women's softball team. (Doc. 1 at 23–24.)

### III.   SUMMARY JUDGMENT STANDARD

Under the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Rule 56 [ ] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. If the movant meets this threshold, the nonmoving party must "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted).

On summary judgment, the court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Any factual disputes will thus be resolved in the non-movant's favor, but only when sufficient competent evidence supports the non-moving party's version of the disputed facts. *Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).

A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, that party must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. If the non-movant's response relies on nothing more than conclusory allegations, the court must enter summary judgment for the movant. *See, e.g., Holifield v. Reno*, 115 F.3d 1555, 1565 n.6 (11th Cir. 1997); *Harris v. Ostrout*, 65 F.3d 912 (11th Cir. 1995).

**IV.   ANALYSIS**

Nemeth asserts Auburn retaliated against her in violation of Title IX by failing to award her a roster spot on the women's softball team for the 2017/2018 year. Nemeth

5

claims this was in retaliation for her Title IX complaints about the previous coaching staff. Auburn, on the other hand, claims that the new coaching staff determined that Nemeth, like the other seven individuals who tried out but did not make the team, was not a SEC-Division I caliber softball player who could help the team. (Doc. 54 at 15; Doc. 54-1 at 4–5.)

Title IX retaliation claims are analyzed under the Title VII burden shifting framework. *Kocsis v. Fla. State Univ. Bd. of Trustees*, 788 F. App'x 680, 686 n.4 (11th Cir. 2019) (citing *Bowers v. Bd. of Regents of Univ. Sys. of Georgia*, 509 F. App'x 906, 911 (11th Cir. 2013)). To establish a prima facie case of retaliation under Title IX, Nemeth must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse action; and (3) the adverse action was causally related to her protected activity. *See Bowers*, 509 F. App'x at 911; *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1134–35 (11th Cir. 2020).

"Once the prima facie case is established, it creates a 'presumption that the adverse action was the product of an intent to retaliate.'" *Gogel*, 967 F.3d at 1135 (quoting *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)). At that point, the burden of production "shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for the employment action." *Id.* "If the employer produces such a reason, the presumption is rebutted, and the plaintiff must then demonstrate that the proffered reason was merely a pretext to mask retaliatory actions." *Id.* (quotation marks omitted). Further, "[t]o establish the necessary causation, a plaintiff must demonstrate that 'her protected activity was a but-for cause of the alleged adverse action by the

[defendant].'" *Gogel*, 967 F.3d at 1135 (quoting *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)). "In other words, a plaintiff must prove that had she not engaged in the protected conduct, she would not have [suffered the adverse action]." *Gogel*, 967 F.3d at 1135 (citing *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018)). "Importantly, throughout this entire process, the ultimate burden of persuasion remains on the [plaintiff]." *Gogel*, 967 F.3d at 1135 (quoting *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013)).

Auburn concedes for summary judgment purposes that Nemeth can establish a prima facie case of retaliation. (Doc. 54 at 14–15.)  Instead, it focuses its challenge on the pretext analysis; that is, it had a legitimate, non-retaliatory reason for not awarding Nemeth a roster spot, which was the new coaching staff's belief that Nemeth was not sufficiently talented to play SEC Division I softball. (Doc. 54 at 15; Doc. 54-1 at 4–5.)

The burden borne by a defendant seeking to rebut the presumption of retaliation established by a prima facie case is "exceedingly light." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) (citation omitted). To satisfy this burden, the defendant "'need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it [retaliated] against the plaintiff.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981)). The defendant "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by [retaliatory] animus." *Id*.

7

The court concludes that Auburn has articulated a sufficiently legitimate reason for not awarding Nemeth, a former walk-on who played, if at all, only sparingly for the previous coaching staff, a roster spot for the upcoming season. New coaching staffs must make assessments of their team and team needs, and previous walk-on team members are not guaranteed roster spots through the expiration of their collegiate eligibility, especially through the transition of a new coaching staff.

Therefore, to defeat summary judgment, Nemeth next must demonstrate that Auburn's stated reason was "merely a pretext to mask its real reason" to retaliate against her for protected conduct, including the filing of a Title IX complaint, and in addition, that *but for* her complaint, Nemeth would have been placed on the team roster. *Gogel*, 967 F.3d at 1136; *Combs*, 106 F.3d at 1528. Crucially, the "but for" causation test at the pretext stage is more demanding than the one Nemeth faced at the prima facie stage, *Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1294 (11th Cir. 2021) (citing *Nassar*, 570 U.S. 338, 362; *Gogel*, 967 F.3d at 1135 n.13), and requires her to show that, based on the evidence, "one could reasonably infer that but for her protected conduct [Auburn] would not have taken the alleged adverse action." *Id*. To this end, Nemeth "is not allowed to recast" Auburn's proffered nondiscriminatory reason or substitute her own judgment for that of Auburn. *Chapman v. AI Transp*., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). And as the Eleventh Circuit has repeatedly emphasized, if the proffered reason is one that might motivate a reasonable defendant, the plaintiff "must meet that reason head on and rebut it," and cannot succeed "by simply quarreling with the wisdom of that reason." *Id*.

8

To establish pretext at the summary judgment stage, Nemeth "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [] proffered legitimate reasons for [the adverse] action that a reasonable factfinder could find them unworthy of credence." *Tolar*, 997 F.3d at 1298 (citation omitted). "A reason is not pretext for retaliation unless it is shown both that the reason was false, and that retaliation was the real reason." *Id*. Nemeth must come forward with evidence, which can include the previously produced evidence establishing the prima facie case, that is sufficient to permit a reasonable factfinder to conclude that the reasons given by Auburn were not the real reasons for putting her on the team. *See Combs*, 106 F.3d at 1528.

Nemeth first argues that there is temporal proximity between her protected activity and her being deprived of a roster spot.[2] (Doc. 57 at 15.) Given that the operative adverse action in this case is Nemeth's deprivation of a roster spot by the new coaching staff in late September 2017, and the latest instance of protected conduct was her father's email to a member of the Auburn board of trustees a month earlier in August 2017, Nemeth argues that this demonstrates the retaliatory act by Auburn was "very close" in time to her protected activity. (Doc. 57 at 18, citing *Aaron v. Bd. of Regents of Univ. Sys. of Georgia*, 58 F. Supp. 3d 1368, 1380 (M.D. Ga. 2014)).

---

[2] Nemeth appears to argue for application of the "continuing violation" doctrine in an effort to back door other incidents of retaliation, such as removal from the team, that are otherwise time-barred. (*See* Doc. 57 at 23.) Ordinarily, continuing violations are exceptions to the general rule requiring a timely complaint covering discrete discriminatory acts. *Short v. Immokalee Water & Sewer Dist.*, 165 F. Supp. 3d 1129, 1142 (M.D. Fla. 2016) (citing *Nat'l R.R. Passenger Corp.* v Morgan, 536 U.S. 101, 118 (2002); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1221–22 (11th Cir. 2001)). However, the sole remaining claim in this case is the new coaching staff's decision not to award Nemeth a roster spot, which was an issue confirmed by the court via order dated April 20, 2020. (*See* Doc. 40.)

It is true that while the burden of causation can sometimes be met by showing close temporal proximity between a plaintiff's protected activity and an adverse action, "temporal proximity, alone, must be 'very close.'" *King v. Sec'y, US Dep't of the Army*, 652 F. App'x 845, 847 (11th Cir. 2016) (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)). Furthermore, "while close temporal proximity between the protected action and adverse employment action is evidence of pretext, it is not necessarily sufficient alone to establish pretext." *Id.* (citing *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006); *see also Tolar*, 997 F.3d at 1299 (citing *Gogel,* 967 F.3d at 1137 n.15) ("[w]hile close temporal proximity between the protected conduct and the adverse [] action can establish pretext when coupled with other evidence, *temporal proximity alone is insufficient*.") (emphasis added).

Auburn does not appear to quibble with the temporal proximity issue.  Instead, Auburn accurately claims that Nemeth must produce something more.

That "something more" requirement proves to be a stumbling block for Nemeth. Though she does advance the following five points, including (1) Nemeth's continued presence on the roster displayed on the team website as late as July 2017; (2) a general custom that walk-on players who were on the team for one season were not required to try out the following year; (3) differential treatment given to two other walk-on players who did not make Title IX complaints; (4) the fact that Nemeth later made the softball team at Elon University; and (5) Auburn's suspicious actions in hiring a new coaching staff and making personnel and procedure changes following the disposition of Nemeth's Title IX appeal, none are sufficient to demonstrate pretext.

10

The problem for Nemeth as to all of these is simple: she was assessed by and not awarded a roster spot by an entirely new coaching staff that was retained in September 2017. It was largely irrelevant that Nemeth appeared on the team roster as late as July 2017, or that the previous coaching staff had a custom of not requiring walk-on members to try out each year. Indeed, coaching staffs manage team rosters in different ways, and Nemeth offers no evidence whatsoever that her experience was out of the norm for walk-on players and new coaching staffs.[3] After all, the roster spot expectations of a walk-on player are not equivalent to those of a scholarship player.

But that is not the only problem with Nemeth's counterpoints, which also fail to identify any other similarly situated players who were treated more favorably than Nemeth. *See Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1223-24 n.9 (11th Cir. 2019) (Although the comparator analysis is conducted at the prima facie step of the *McDonnell Douglas* burden-shifting analysis, it can also "of course be used" to demonstrate pretext at the third step.). For example, Nemeth contends that there were two other walk-on players who were allowed to remain on the team without tryouts despite not having engaged in protected conduct. (Doc. 57-1 at 13.) But neither individual is a proper comparator because neither individual was on the team in the Fall of 2017—one individual's eligibility had expired, and the other did not return to the team following the Spring 2017 season. (Doc.

---

[3] Nemeth's assertion that Coach Dean's team tryout was "rushed," (*see* Doc. 57 at 19), is conjectural, and as such, the court will not consider it. *See Williams v. Harco Drugs, Inc.*, 896 F.Supp. 1150, 1154 (S.D. Ala. 1994) ("suspicions [ ] do not create a triable issue of fact."); *Pace v. S. Ry. Sys.*, 701 F.2d 1383, 1391 (11th Cir. 1983) ("A plaintiff, when faced with a motion for summary judgment, cannot rely on attenuated possibilities that a jury would infer a discriminatory motive[.]").

59-1 at 1.) Further, Nemeth provides no evidence that either of these individuals were lesser skilled players who were awarded roster sports by the new coaching staff.

True, "a plaintiff also may show pretext by identifying an [individual] outside of the protected class who engaged in comparable misconduct but who received preferential treatment." *Terry v. Laurel Oaks Behav. Health Ctr., Inc*., 1 F. Supp. 3d 1250, 1278–79 (M.D. Ala. 2014) (citing *Rioux v. City of Atlanta, Ga*., 520 F.3d 1269, 1276–77 (11th Cir. 2008)); *see Walker v. St. Joseph's/Candler Health Sys., Inc.,* 506 F. App'x 886, 889 (11th Cir. 2013) ("A typical means of establishing pretext is through comparator evidence.") (citation omitted). But, the comparator must be similarly situated "in all relevant respects," *Terry*, 1 F. Supp. 3d at 1279 (citing *Holifield*, 115 F.3d at 1562). And here, neither individual fits the bill for a similarly situated comparator for pretext purposes.

Nemeth also argues that her ability to obtain a roster spot on the Elon University softball team demonstrates that she was qualified to play on the Auburn team. But undermining that point, in Nemeth's own complaint, she acknowledges that the level of skill required to play at Auburn does not equate to the level of skill needed to play at Elon. (*See* Doc. 27 at 16) ("That school, while a fine institution of higher learning, is not on the same level athletically as an SEC school."). Indeed, as it is axiomatic that federal courts do not sit as super-personnel departments that reexamine an entity's business decisions, *see Chapman*, 229 F.3d at 1030, federal courts also do not sit as super-coaching staffs that reexamine coaching decisions concerning talent, skill, and what constitutes the level of play necessary to succeed in the SEC. The court's inquiry is limited to whether Auburn gave an honest explanation of its behavior. Nemeth does not provide this court a reason to

question the new staff's explanation for Nemeth's team tryout evaluation, especially when Nemeth previously was a walk-on player who played very little, if any, on the previous year's team for a different coaching staff.[4]

Finally, Nemeth argues that the new coaching staff was under the thumb of Auburn athletics administrators who wished to retaliate against Nemeth. Specifically, Nemeth argues that it is "reasonable to believe" that the administrators were involved in retaining the new staff and that the new staff, in turn, retaliated on the administration's behalf. (*See* Doc. 57 at 18–19.)  Nemeth also avers that Auburn suspiciously changed its Title IX policies and procedures less than two months after denying Nemeth's Title IX appeal, and further, that Auburn "cleaned house" by firing several athletic administrators. (Doc. 57 at 20.) But all of these arguments present merely innuendo and conjecture and are insufficient to defeat summary judgment. *See Holifield*, 115 F.3d at 1564 n.6 ("Conclusory assertions . . . in the absence of supporting evidence[ ] are insufficient to withstand summary judgment."); *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value.") (citations omitted). Nemeth presents no basis in the record to support the inferences she asks the court to draw about the new staff's retention and Auburn's actions following her Title IX appeal, and further, does not challenge the new coach's (Dean) testimony that he was not influenced by anyone outside the coaching staff when he made his decision to

---

[4] Perhaps if Nemeth was being evaluated by the same coaching staff (i.e., the Myers) that previously invited her to Auburn and awarded her a roster spot as a walk-on, Nemeth's arguments would carry more weight. But that is not the set of facts presented here.

leave Nemeth off the team, as he did with the seven others who participated in tryouts. (*See* Doc. 54-1 at 5.)

Having failed to demonstrate that Auburn's stated reason for not awarding her a roster spot on the softball team for the 2017/2018 season was a pretext to mask a retaliatory motive, Nemeth has failed to show that a reasonable jury could find that but for her Title IX protected conduct, she would have been awarded a roster spot on the team. Therefore, Auburn is entitled to summary judgment on the retaliation claim.

## V. CONCLUSION

For the foregoing reasons, it is

ORDERED that the Motion for Summary Judgment (Doc. 54) is GRANTED in favor of Auburn University.

DONE, on this the 3rd day of August, 2021.

                                                  /s/ R. Austin Huffaker, Jr.
                                        R. AUSTIN HUFFAKER, JR.
                                        UNITED STATES DISTRICT JUDGE